Good morning, Your Honors, and may it please the Court, Hannah Crow on behalf of Appellant Ms. Melissa Suzette Arzu. As Your Honors are aware, this case is on appeal from the Northern District of Texas following the grant of a summary judgment in favor of American Airlines. This Court will review the facts of the record de novo and in the light most favorable to the non-movement Appellant Melissa Arzu. Because the summary judgment record in this case contains disputed material facts that the District Court disregarded, we ask that this Court reverse and remand for trial on the merits. The particular facts of this case involve the death of a 14-year-old child, Kevin Greenidge, on an international flight from Honduras to the United States. Because Kevin died on an international flight, this case is primarily governed by an international treaty called the Montreal Convention. I'm sure the Court is familiar with the Montreal Convention, but this is a bit of a unique area of law, so I would like to spend a few moments discussing the treaty and the governing precedent before I move on to the facts of this case. Like I said, the Montreal Convention is an international treaty that establishes the liability framework for airlines for international flights. And what this particular treaty did is create what is known as a modified strict liability scheme with a series of policy tradeoffs. So on the one hand, airlines like American are afforded with very generous protections, such as protection from any and all claims for passenger punitive damages, no matter what the injury is, even loss of life. On the other hand, and in exchange for those types of protections, passengers are entitled to compensation for something called an accident. Now, an accident is different than the issue of negligence, because under the Montreal Convention, the plaintiff bears the burden of proof for the issue of accident, but the airline actually bears the burden of proof on the issue of negligence or non-negligence. So, what is an accident? Well, the Montreal Convention does not define accident itself, but the Supreme Court has defined accident in the seminal case Air France v. Saks. And in that case, the Supreme Court defined the term accident to be an unexpected or unusual event or happening that is external to the passenger. Now, with respect to causation, also in the Saks case, the Supreme Court held that it recognizes that any injury is undoubtedly the product of a chain of causes, and we require only that the passenger be able to prove that some link in the chain was an unusual or unexpected event external to the passenger. One other important holding from the Air France v. Saks case is that with respect to the accident inquiry, the Supreme Court held that in cases where there is contradictory evidence, it is for the trier of fact to decide whether an accident occurred and caused the passenger's  And that is the very case that we are faced with here today. Here, not only do the parties dispute whether what happened on flight 614 was unexpected or unusual and therefore possibly rising to the level of an accident, the parties also dispute the very underlying facts of what actually happened on the flight. Because of both of those reasons, this case was inappropriate for summary judgment. If your honors don't have any questions on the Montreal Convention at the moment, I'd like to move on and discuss the facts of flight 614. Could you discuss White v. Emirates Airlines, Inc.? Yes, I'm happy to discuss White v. Emirates Airlines, Inc. That is a per curiam case from the Fifth Circuit in which a passenger fell extremely ill in the plane's final descent. When you said per curiam case, are you trying to say that it's because it's not published that it's different than per curiam? Or do you believe it's binding precedent in the Fifth Circuit or not? I believe, because it's per curiam, I do not believe it's not per curiam. Per curiam has nothing to do with binding precedent or not. Per curiam just means who wrote it and whether it's for the court or not. Understood. I think that White and Blanchett, which is the other Fifth Circuit case, are both binding on this court along with Air France v. Saks and Hussein. It's not a published case, and so that could make it not binding, and that's what I was wondering.  Regardless, I think it's a case that this court would understandably look to because there have not been very many Montreal Convention cases. And the court held in that case that a flight crew's arguably imperfect response to a passenger's medical emergency does not necessarily constitute an Article 17 accident in a firm summary judgment. And it's our position that that case does not necessarily help the court resolve this case and is not against our position at all. The facts of that case were that the flight in White was in its final descent when a passenger fell ill. The flight was literally 10 minutes away from landing. Despite that, the flight attendants, how that case actually unfolded, and this is in the case, the flight attendants found this particular passenger in the lavatory 10 minutes before the flight landed in Houston. Because of that, there was no ability to divert the flight because the flight was already landing, and there was no ability for the flight attendants to do anything beyond what they did, which was render the minimum aid that they could at that time. I want to be very clear. The Fifth Circuit did hold in that case that the court can and should look at the overall context of what's happening on the flight when determining whether something is unexpected or unusual. And in that particular case, the context was that the flight was literally in its descent and landing. We're not faced with the facts, with that sort of factual context here that would excuse or make otherwise perhaps unexpected or unusual occurrences by law expected and unusual. Excuse me, expected or usual. Maybe you should tell us about what happened on the flight then. Yes, I would be happy to. Judge Graves, did you have a question? No, go ahead. Our position is the obvious and the most easiest path for the court to resolve and reverse this case is the AED issue. One of the core factual issues in this case is whether or not the federally mandated AED on board flight 614 malfunctioned or operated correctly when it was used on Kevin. And evidence of this hotly disputed material fact was presented by appellant in opposition to Americans' motion for summary judgment, but it is not referenced anywhere in the district court's order disposing of this case in favor of Americans. Well, to be clear, we're talking about a 14-year-old boy, 5 foot 6 inches tall, who weighed 319 pounds, and he's not a well person. We start from that. That's a backdrop to this unfortunate event. Yes, that is the undisputed profile of the decedent in this case. But that said, what do we do with the fact that the AED assertively did not function? What we do with the fact that the AED did not function, which a reasonable jury could certainly find, is the court recognizes that not only could a reasonable jury find it. If that's, I suppose there is a fact question about that, but that's certainly at least a fact question as to whether the defibrillator was working. Certainly. It's our position that it was certainly a fact question as to whether or not the defibrillator was working. And because federal law required flight 614 to be equipped with an operable AED machine, a reasonable jury could find that the failure for the flight to be equipped, so equipped, was unexpected or unusual. And that rises to, we believe that rises to the level of accident, because the definition of accident is something unexpected or unusual. Do you know why the district court didn't reference the AED at all? It has a thorough opinion about all the cases. Why isn't this in there? I do not know, Your Honor. Did you seek reconsideration or anything? We did not, Your Honor. We appealed on the basis of... I'm not saying it was required. I just... Your question is similar to mine. I don't know why it's not mentioned. Like I said, this is one of the hotly contested material facts in this case. And... Well, we're talking about whether this is a, quote, accident under the Montreal Convention that was derived from Warsaw. That's correct, I would think so. To frame the question, we have, we started with the Warsaw Convention originally, and we have derived from that the present possession. Yes, correct. Whether it's actionable or not is characterized as a, whether it is an accident under the  Correct. Whether or not what happened to Kevin is actionable. So that's the issue. And that's why they went to the AED, operative or not. Yes. In terms of liability. Okay, and four people say it didn't work, but the machines shows that it did. Is that right? Something, what are the facts? What are the facts? Yes. So doctor, so Kevin was attended by a trauma surgeon on the flight, Dr. Rachel Amador. She testified at the time of the flight, she had used an AED approximately 50 times on patients in cardiac arrest. She testified unequivocally, this machine did not deliver a shock to Kevin. She did so in sworn declaration and also deposition testimony. Kevin's family members, his aunt and his uncle, not medically trained, of course, but are back there. His uncle's right back there. His aunt is sitting close. Similarly, say there was- Did you have a declaration from a trauma surgeon that said it didn't work? That says it did not deliver a shock. Yes, correct. Just happens to be there. Yes. Oh, yes. She was a passenger on the flight. Yes. And in connection, counsel, with an earlier question, just tell me where in your summary judgment briefing did you argue that the AED malfunction was an article 17 accident because it violated FAA regulations? Is that in your summary judgment briefing, that argument? The argument that there's a fact issue as to whether or not the AED operated that makes the case not appropriate for summary judgment is in our opposition to Americans' motion for summary judgment. I don't have the exact page, but I can get that when I sit down. I want to be clear, it was not presented. We actually also moved for summary judgment on a series of other accidents that occurred on the flight. The AED dispute, we did not move on the AED dispute because we recognize it's a disputed material fact. So it would not be present in our motion for summary judgment. But it's in your defense. In our defense, correct. You didn't forfeit or waive this in the district court? No. OK. I would like to just touch briefly on, and I would like to reserve time for rebuttal, but I would like to just touch briefly on why the failure of the AED machine, why a reasonable jury could find that to be unexpected or unusual and therefore an accident. And that is because not only did federal regulations, but also industry standards and Americans' own policies required Flight 614 to be equipped with an AED. I want to be very clear. It is not our position that any time there is a slip from policy or a mistake made based on a federal regulation, that that necessarily rises to the level of accident. We are not advocating for a per se rule, which has already been rejected by the Fifth Court and not endorsed by the Supreme Court. However, because the AED did not function properly, a reasonable jury could certainly find that to be expected and unusual. I want to, unexpected and unusual. I want to touch briefly on another series of accidents that resulted in the failure of the flight to timely divert. These are the accidents that we moved on in our motion for summary judgment. We have an uncontroverted record that the flight attendants did not immediately alert the flight deck when they found Kevin unconscious. Instead, in the words of flight attendant Brooke Anderson, a significant amount of time passed before she called the flight deck to let them know what was going on. Similarly, at no point in time on this flight was the physician on call contacted. The physician on call is a 24-7 hotline physician available not only to assist with passenger emergencies, but also to assist with diversion. Under American's policies, the physician on call must be called. There is no discretion with that, and that person was never called on the flight where Kevin died. Does that go to your argument about willing inaction on the part of the airline? It does. I don't know that I would have necessarily, you know, we do not suggest that the airline did not respond in any way. So I would not stand here and say there was no action. But the failure to contact the flight deck immediately, the failure to contact a physician on call, these are serious violations that are causally linked to Kevin's death because because the flight deck was not immediately alerted, the flight, the flight, Kevin is unconscious on the back of the plane, and the flight is continuing on away from Honduras, which would have been the closest place to divert. Melinda Blanton, you have to have some willing inaction in order to have an Article 17 violation. Don't you? I think willing inaction is a possible way. There can be, you can have Article 17 accidents because, you know, a luggage falls on someone. That would be an accident. So it's just one category of Article 17. It's not the whole gamut. Willing inaction is not required. It's one theory, and to be Article 17. Exactly. And in this case, the failure to contact the physician on call is an example of willing inaction. The failure to immediately alert the flight deck, and I would just like to, going back to one of Judge Higginbotham's questions earlier about the particular profile of this child, who we don't dispute was overweight and had some health problems. Neither of those things have anything to do with picking up a call and telling the flight deck, there's a passenger who's unconscious, picking up the phone, calling the physician on call. I understand that the fact that the decedent was overweight, you know, might have complicated the response in other ways, but those two things are easy things to do that have nothing to do with the profile of who's in distress. I believe that my time, I'd like to save a few moments for rebuttal, so let me, with that, sit down with your Honours on that for their questions. Thank you. Thank you. Good morning. May it please the Court. Caitlin Hubbard for Appley American Airlines, Incorporated. The Montreal Convention does not impose liability for tragic outcomes for unsuccessful rescue efforts. It imposes liability for an in-flight accident, an unexpected or unusual event external to the passenger that causes injury or death. Applying Air France v. Saks and this Court's decisions in Blancet, Judge Gray, and then in White, the District Court correctly determined that there was no Article 17 accident as a matter of law, and while you did not reach causation, that's something I'd like to discuss with you today. Can you talk a little bit slower? Yes. Just in a way that the resonance in the room, it's, I need to talk slower.  Thank you. So we believe the Court should affirm for two reasons. First, even accepting all genuine fact disputes in Arzu's favor, there was no Article 17 accident as a matter of law. And second, even assuming there was an accident attributable to American, there is no legally sufficient evidence of causation. This is relevant directly to the point that has been raised through the panel's questions. I'd like to get a little bit of background on the accident inquiry in this Court's decisions in Blancet, in White, and how the nationwide decisions— Can you slow down again? Yes, Your Honor. And how the nationwide decisions possess that. As you've been told and you understand, under Saks, an accident is an unexpected and unusual event external to the passenger. Saks emphasized, and this Court has agreed, that that accident inquiry is flexibly applied and must account for all of the circumstances attending the passenger's injuries. Now, there's no dispute in this case that Kevin unfortunately suffered a cardiac arrest due to internal factors of his own. So the argument here is that American's emergency response was allegedly deficient and contributed to his death. The District Court rightly collected this Court's authorities and those of other decisions, making very clear that this case is fundamentally different in kind from those other cases involving emergency responses to in-flight medical events where courts have even entertained the theory that this is an accident. So go through those decisions. The United States Supreme Court's decision in Olympic Airways v. Hussein, what happened there is a flight attendant three times refused a passenger's request, an asthmatic passenger's request, to move away from the smoking section. The Court there said that this rejection of an explicit request for assistance would be an event or happening under the ordinary understanding of those terms. There was no denial of an explicit request for medical assistance in this case. American responded that it's undisputed. In the McCaskey hypothetical that you've heard about in briefs, what the District Court said there is that it would be an unexpected and unusual event if an aircrew blithely refused to divert when it was undisputed that the passenger was in an imminent medical emergency state. That didn't happen here either. What happened here was a response from American that, just like in flight, RZU was claiming just wasn't good enough. This Court has laid down ground rules in determining what is not an accident, and both of those ground rules are relevant to this case. The first one, in Plansif, this Court specifically rejected a per se rule that any deviation from policy or industry standards is an accident. It said, and you've heard it from the other side, that we evaluate context. Not disputed context, undisputed context. That is American's position in this case. And in white, evaluating context, the Court held that even if white proves arguably an perfect response, it's not necessarily an Article 17 accident. Those decisions control this case. The decisions that white collective control this case. Why does it say not necessarily as opposed to just not? It seems like it leaves some wiggle room. I think that, yet I agree with you, I think that is where the context comes in. In white, part of the context was what the decision specifically said is the flight crew did more here than in other cases. This was not Hussein. This was not a case, the McCaskey hypothetical, where there was a refusal to provide care. We understand that planes are not flying hospitals, that flight attendants are not trained to have formal training of licensed medical professionals. And because they don't have that training, they have this call-in service that they use. Correct. How come they didn't use it? They did not use it because the captain immediately made the decision to divert. It was a big force scenario. And that scenario, under American's policies, the flight crew, number one, is not the one that makes that call. It's the captain's call that's made at all. And American's policies make very clear that the captain makes that call if time, permit, time and conditions permit in his discretion. Captain Wingen made very clear in his testimony, as soon as I heard that we were in a big four event of a cardiac event of a minor, I decided immediately I'm diverting and I'm not wasting precious minutes calling the physician on call. And it is minutes. That's what the policies warn. It may take minutes to connect to the med link. And white was the argument. Was there a substantial delay in alerting the captain? I believe that's the argument. But that ignores what the flight attendants were doing in this time period. Recall that when the call for help came for Kevin, there were two beverage carts in the  Flight attendants were split apart. One of the flight attendants immediately came and assessed him. Another one jumped over a beverage cart to come and help. Anna Arzu, Kevin's aunt, said, I can't really tell you what that time was. The question was, was it seconds or was it minutes? And she said, maybe minutes. But she couldn't really tell you the time. It's a chaotic situation, I understand. He jumped over the beverage cart, immediately realized he's 320 pounds, five foot five. I'm going to need help getting him out of his seat. And everybody in Brucene had to be pulled from his seat. You cannot do CPR in a seated position. He was also too large to be laid in the aisleway. So he needed to be carried sideways to the aft gap. Everyone also agrees that this took at least five to 10 minutes. That was required, usual, and expected. There's nothing unusual and unexpected about that. And I would say, and I'm going to get to this later, this presents a significant causation problem for Arzu's case. Because her own expert, Dr. Corwin Gorman, testified Kevin's chances of survival started at 90%, and they decreased by 7% to 10% for every minute that passed. So your Honor, look at the five to 10 minutes to remove him from his seat alone. And Kevin was more likely than not not going to survive. There's other causation issues specific to A&D that I'd like to discuss. But we cannot put blinders on to the fact that this was a child that had to be removed from his seat, was on the window seat, was 320 pounds, wedged into an airway. Isn't that a different argument than whether or not it was an accident? It seems to me that that's causation. And that's not whether or not it constitutes an accident. I agree with you. The minutes and how that affected his likelihood to survive is causation. But the context, just like in White, were in our final dissent, it didn't make sense to call the physician on call because they were landing anyway. The context that it did take time to pull him out of his seat, and in fact it took Fitzpatrick and three able-bodied men, informs the fact of what the flight attendants were doing at this time, and that any minor policy violation, which we don't think actually occurred, is explained by the context the flight attendants were presented with when they got to row 32. So we have one flight attendant assessing him, another one working to pull him from his seat with at least three other able-bodied persons. We have flight attendant Tran at the front that is calling for qualified medical professionals twice, which she got, and also moving the beverage carts out of the aisle so that people can safely pass. We have the third flight attendant, Brooke Anderson, who runs to get the AED, which arguably in minutes, in her view, is the most important medical device. As soon as she jumped back over beverage carts to deliver the AED, she went back to the flight deck to inform the captain, and the captain immediately diverted and landed 17 minutes later. That is undisputed context that does inform the accident inquiry. When we get to the AED in particular, because I think that's important to discuss, there are three issues. The first one is, is there a genuine fact dispute that the AED was inoperable or did not deliver a shot? The second one is, is that an accident under Article 17? And the third is, did it have any impact on Kevin Greenidge's likelihood to survive? Take those each in order. You asked a question about the witness testimony, Judge Elrod. There is a misstatement, I believe, in the reply writ that says Nurse Thatcher did not believe there was a shot delivered. In fact, she did. She testified repeatedly at ROA 17-18, 19-14, 20-51-52, 20-55, and 20-4-10. The individuals that testified, they did not perceive a shot, and I want to be clear on that. There were family members, lay witnesses that said, I didn't see his body react. That does not respectfully mean that a shot was not given. Again, Kevin was 320 pounds. What about Dr. Amador? Dr. Amador- At no point did the AED deliver a shot. Yes, and that was a declaration attached to Arzu's motion to compel early in the case. When Dr. Amador was actually deposed, her testimony was a bit different and said, I do not recall observing any sort of signs from Kevin that would lead me to believe he received a shot. That was ROA 20-47. She also agreed with Dr. Orwin-Hormank, who is a plaintiff's expert, a medical expert, and she also agreed with Nurse Thatcher that you would not necessarily see that response. Now, I want to be candid with the court. There are other witnesses, flight attendants, some that said, I think I saw his body move, lift from the ground. I respectfully submit that these are different perspectives of people in different positions that may be using words differently. But the fact remains, in Scott v. Harris, the question is, is there objective evidence that makes that fact dispute of different perceptions in a crisis immaterial? And there is objective evidence in this case, and I think the story of how it got here is relevant. When the case was filed, Arzu immediately filed a discovery and a motion to compel on the AED. She didn't believe we had it. We did. Within two months of American filing its answer, American produced the AED, provided it for inspection, and said, we will also verify our interrogatory responses. That is, at ROA, and in fact, Arzu filed a notice that her motion to compel was moot. She said, at the time, the AED is concrete proof of its functionality, the best evidence. She then filed a notice that said, American has agreed to verify its interrogatory responses to prove a clear chain of custody, and she told the court that if that didn't happen, I'll come back and I'll renew my motion. That's ROA 1130, her notice. She never came back to the court on that issue because the AED was produced, and then both sides' experts referenced the AED data throughout their reports. So what you have here is an objective AED defibrillator strip that shows that the pads attached, it did not give a warning that there was any sweat or moisture that impeded connectivity, that it assessed heart rhythm for 26 minutes. By the way, the witnesses agreed that it gave automated warnings to them to start CPR, stop CPR, shock device. So the argument you have in this case is, despite all of that, we should believe that the AED may have worked, but perhaps the shock didn't get through to Kevin. Despite the fact that the readout assesses his heart activity and has a clear spike at the time, it says shock device at ROA 2425. Respectfully, Your Honors, there is simply objective conclusive evidence that the AED was operable. It is speculation that it was not. Speculation that perhaps the pads were expired or didn't attach well. If the AED was inoperable, could it also be inoperable in its objective readout? Will the objective readout show that it worked, Your Honor? Yes, that's the question. The objective readout is part of the AED, which is the device that we're trying to decide is broken or not. So is it possible that it's not an objective readout if it's broken? Are we going to trust the device that may be malfunctioning itself to give us evidence that trumps everything else? Well, the malfunction alleged is that it did not give a shock. But the AED itself on the status strip says shock given. I understand that. But I'm saying if the device is malfunctioning... Why isn't the detribalator giving you a false read? Thank you. I'm sorry? Why isn't the device giving you a false read? That's one possibility. Your Honor, there's no evidence of that possibility. I understand. That's the question, though. If it's defective otherwise, then it may give you a false read as well. I think potentially... In other words, if your argument, as I understood it, was that you weren't getting a... The machine did not give you a readout. And suggesting that I thought that there was no failure of the equipment itself. I understand the question. I think that if there was any evidence that it had not been inspected or that it was expired, maybe that would be a possibility. The evidence in this case is that it was inspected as within expiration for the next year, three months before Flight 1614 took off. And in ROA 1880, all flight attendants showed they were in light blinking, showing it was operable when they boarded the flight. So I don't think that that is a possibility in this record. But I want to note that let's just accept it's true. This alleged fact was viewed on the AED. And by the way, Judge Briggs, I think the reason it was not a focus of the argument below is after American allowed the inspection and the experts and everybody started relying on the AED, it kind of floated to the back of the case. It was not a principal focus of the party's arguments. But I want to look at both is this an accident and causation. On accident, we know in the Montreal Convention and the Warsaw Convention that the drafters knew that, again, planes are not flying in hospitals. They did not expect that level of expertise or proficiency. So the question here is if the evidence is conclusive, and it is, that American did, in short, file its inspection record that it was within expiration, did visually inspect it with the support of the plane. American did exactly what the issue was in planes. It complied with the federal regulations. The federal regulations are a carry-and-inspect statute. You have to have it on board, and you have to inspect it. It's exactly what American did. I think that's why the Fourth Circuit in Hippolito said they have the oxygen bottle. It didn't function in this case, so it's still not an accident. It's a matter of law. I want to go to causation here because I think there is a significant causation issue with respect to the AED. Dr. Warming, RZU's medical expert, testified in his deposition, there's a 71.4% chance of survival if a out-of-hospital shot is given. But he said survival to the hospital. Do not let that escape you because it matters. Survival at a hospital is not the relevant inquiry. The relevant inquiry is actual survival. Survival at the hospital, discharge. So there was no basis for Dr. Warming's opinion that if this AED shot, which we believe was given, but bear with my hypothetical, if it was not given, that Kevin actually would have survived. And here's the other part of this. We made that argument that there was no evidence of causation. Dr. Warming specifically would not say that Kevin would have survived had some quicker response been given. He said repeatedly, that would be folly for me to give you an opinion. But on this 71.4% metric, it comes from a study called the MNAN study. When we got the argument, his summary judgment, that Kevin more likely than not would have survived based on this MNAN study, American filed a motion for leave to add to the record that specific study. Because here's what it says. There is a 71.4% chance of survival due to hospital admission. There is a 33% chance of actual survival. And when someone is asystolic, nonchalant with a heart rhythm, like Kevin was when they got him to the back alley, that likelihood of survival drops to just 3%. There is no legally sufficient evidence of causation, and you can reach that outcome, whether you consider the motion to leave or the undisputed MNAN study. By the way, Arzu opposed the motion for leave, not because she disagreed with the MNAN study, but because she just said why you shouldn't have put it in originally. There's no dispute about what the MNAN study says. But if you go back even to what it is, specifically in the pre-existing summary judgment record, the only thing Dr. Warne said is 71% to hospital admission. I think he did that for a reason, because it's not a relevant metric, but certainly it can cause some confusion. So there is a causation problem in this case that is an independent ground to support the record. I would like to address one other thing with the policies. Judge Graves, I think you're right. There is a dividing line between the cases like Hussain and the McCaskey hypothetical where you have a ruling in action, and a case like this one where there's no dispute that the flight attendants responded, that they worked to get him out of his seat, that they provided CPR for 45 minutes with sweat dripping from them that they needed to ask for a break, that they got the AED, they delivered the AED, they connected it, and they administered it. They also called for qualified medical professionals. This is a case controlled by Wiley. In the context, even an arguably imperfect response from medical professionals is not an accident. The context makes clear that these were people working in a chaotic setting to save a 14-year-old flight. They have called the flight attendants frazzled. They have said they had an emotional response. I am sure they did. They are humans. They are not trained medical professionals. We do not believe that there is any legally sufficient evidence of an accident, and we don't believe that there is evidence of causation for all of this. We ask that the court respond. Thank you, Your Honors. On response, I would like to address three points. I would like to discuss the AED briefly. I would like to respond to counsel's arguments on causation, and then I would like to discuss White to close. On the AED, we do not have any sort of objective evidence here. What we know about this AED is that the trained trauma surgeon says it did not deliver a shock to Kevin. If you look in the record, she's clear in her sworn declaration, which in and of itself creates a fact issue, and in her deposition. But she recant in her deposition. She did not recant in her deposition. She did not. Her testimony is bolstered, in fact, by that of Karenna Thatcher, who was the nurse trying to use the AED on Kevin, who says in her deposition, this is at 2051 in the record, she tried to deliver the shock. And she says, I'm quoting, I know we were like, did it shock? And we're like, just continue CPR. She saw nothing to indicate that Kevin received a shock as nor did Dr. Amador or the family. Contest this with flight attendant Fitzpatrick, who claims, no, no, Dr. Amador and Karenna Thatcher weren't operating the AED machine. I was operating the AED machine. This is on 3136. He says, I hit the button. His body came off the galley floor. Flight attendant Blanchard, a different flight attendant, this is at 3146. She says, no, no, I pushed the button. I delivered several shocks. So we have three different people claiming to operate this machine, two different flight attendants, one doctor and nurse team. I don't know what the jury is going to do with this, but it is not clear. They're big fact issues. With respect to the machine, I think your question was exactly where I was going to go, Judge Elrod, which is that if the machine is not functioning, how can we believe? It's like a robot being like, I'm working, but being broken. We don't believe that this machine was functioning. And therefore, the evidence that is presented as definitive proof that it was is the broken machine itself. This is not a case like Scott versus Harris, where you had a videotape of what was going on and where the videotape itself was uncontroverted. No one was saying, oh, no, I think that videotape was problematic. I think that's all I'll say on the ADD, unless your honor has no further questions. I'll just speak on causation very, very briefly to say that the district court did not reach the issue of causation. Of course, this court is on a Genova review and can do so. But again, the question is, were any of American's failures linked in the chain of the causes of Kevin's death? And in support of our causation burden, we have submitted the testimony of Dr. Worming. He's the former medical director of the Cook Children's Emergency Department in Fort Worth and the current Cook Children's clinical officer. His opinion at 1791 and 2233 of the record is that the malfunctioning AED contributed to Kevin's death, linked in the chain, and that Kevin, more likely than not, would have survived his cardiac arrest, had the flight crew timely initiated CPR, and used a functional AED machine. That is more than enough causation support to make our prima facie a showing at the summary judgment stage. And to the extent that American wants to attack Dr. Worming, look at his studies, those are all, that's great fodder for Cross at trial, and those all go to the weight of his testimony, which is a jury issue, as your honors know. I will finally, I realize I'm speeding, I will finally just read, I want to read from white, because I want to be very clear about what the context was. The context is, any emergency in a flight, it's an emergency. The context is not, oh, this is an emergency, it's a stressful situation. This is the context in white. Even accepting as true plaintiff's contention that the Emirates flight crew failed to follow all relevant procedures set forth in the manual, we agree with the magistrate judge that when evaluated in context, the crew's failure to do so was not unusual or unexpected. As noted, the plane was in its final descent when a flight attendant first discovered that Wilson had collapsed in the lavatory. Accordingly, the flight crew's ability to respond was limited by the short time period in which it had to act and by the need to ensure the safety of other passengers and crew. For instance, because other passengers were required to be seated during landing, it was inadvisable for the crew to seek assistance from medical professionals on board, and it would have made little sense to contact MedLink to obtain advice regarding possible diversion of the flight. The white case involved an undisputed factual record where the plane was landing. The holdings there are limited to that particular context, which did not occur here. I believe I have nine seconds left, so are there any questions that I can address from your honors? I think we have your argument. Okay, thank you so much. Thank you. We appreciate the arguments in this case today. This case is submitted. This concludes the sitting of the Court of Appeals, and the court will stand adjourned pursuant to the usual order.